# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Consol Pennsylvania Coal Company, : 
LLC, : 
　　　　　　　　　　Petitioner : 
 : 
 : 
　　　　v. : 
 : 
Department of Environmental : 
Protection, : No. 351 C.D. 2015
　　　　　　　　　　Respondent : Argued: November 16, 2015


BEFORE:　HONORABLE DAN PELLEGRINI, President Judge
　　　　　HONORABLE MARY HANNAH LEAVITT, Judge
　　　　　HONORABLE PATRICIA A. McCULLOUGH, Judge


OPINION BY
PRESIDENT JUDGE PELLEGRINI　　　　　　FILED: December 15, 2015


　　　　Consol Pennsylvania Coal Company, LLC (Consol) petitions for review of the order of the Environmental Hearing Board (Board) granting the Department of Environmental Protection's (Department) motion to dismiss as moot Consol's appeal from the Department's issuance of a permit revision. For the reasons that follow, we affirm the Board's order.


## I.

　　　　In connection with its operation of an underground bituminous coal mine formerly known as the Bailey Mine[1] in Greene County, Pennsylvania, Consol

---

[1] Although the mine is now known as the Harvey Mine, it will be referred to as the Bailey Mine as it was known as at all times relevant to this action.

applied to the Department for a permit revision seeking to conduct longwall mining activities on 2,438.54 acres not covered by the initial permit.

## A.

The permit application is governed by requirements developed by the Department, including standards under the Department's Module 8 regarding "Hydrology / Baseline Biology" to ensure that streams which may be undermined by applicants' proposed mining activities are not adversely affected. (Reproduced Record [R.R.] at 188a.) "Adverse effect" is a term of art meaning "mining induced changes that may impair surface water quality." (*Id.* at 85a.) With regard to streams, such impairment includes loss of flow, more than 12% reduction in the average biological score of a stream reach based on a comparison of pre- and post-mining biological scores, and reductions in the length of certain intermittent or perennial streams.

Section 8.9 of the Module concerns "Potential Areas of Flow Loss within the Stream" and instructs as follows:

> b. Using Form 8.8B, (Stream Delineation and Bioassessment Summary), include baseline information on fish and macroinvertebrate communities sufficient to delineate stream segments that qualify as "biologically diverse", "biologically variable", and point of first use based on the criteria and procedures outlined in Appendix A of the Technical Guidance Document "563-2000-655".
>
> c. Provide an assessment of the condition of the macroinvertebrate community in each stream augment identified as "biologically diverse" in item b above, using Form 8.8C (Quantitative Multi-Habitat Bioassessment Of

2

Diverse Community) and 8.8D (Biometric And Total Biological Score Summary). Each assessment should consist of Form 8.8C documenting the results of each sampling event (minimum of two) and Form 8.8D documenting biometric calculations and calculation of the "Mean Total Biological Score." (Additional information on performing aquatic life use assessment is found in the Technical Guidance Document 563-2000-655.)

(R.R. at 202a.)[2] Section 8.10 of Module 8 imposes substantially similar requirements with regard to streams having gradients of 2% or less that will undergo subsidence as a result of mining and therefore may result in pooling.

Further, the Department's Bureau of Mining Programs issued Technical Guidance Document 563-2000-655, entitled "Surface Water Protection – Underground Bituminous Coal Mining Operations" (*Guide*) to assist the Bureau's staff in reviewing underground mining applications and to "provide[ ] guidance to the regulated community regarding how to comply with existing legal requirements." (*Id.* at 84a.) To this extent, the *Guide* provides procedures governing "the Department's manner of interpreting the existing legal requirements applicable to surface water protection, and its recommended approach for mine operators to comply with these existing requirements, in the context of impacts on streams…caused by underground mining operations." (*Id.* at 89a.)

---

[2] None of the applicable regulations define the terms "biologically diverse" or "biologically variable."

3

Appendix B to the *Guide* discusses the Department's Low Gradient Stream Assessment Protocol which governs the sampling of biologically diverse stream segments. Under the protocol, pre-mining sampling is performed to "assess a stream's level of use of attainment" and yields an aquatic life use attainment score (biological score) that can be compared with post-mining samplings from the same biological monitoring point to "assess the magnitude of mining-induced change." (*Id.* at 113a.)

Among other requirements, the *Guide* mandates that the following data be included in applications:

(A) Delineation of all biologically diverse and biologically variable segments which are likely to experience mining induced changes during the five-year term of the permit.

(B) At least 12 months of flow data for each stream that may be susceptible to mining induced flow loss within the first two years of the permit term.

(C) At least one total biological score for each stream reach that is likely to experience mining induced flow loss or pooling within the first two years of the permit term.

(D) At least one Wolman Pebble Count for each stream reach that is likely to experience mining induced pooling within the first two years of the permit term.

(E) The identification of wetlands in areas that will be subsided or undermined at depths of less than 100 feet during the five-year term of the permit.

4

(*Id.* at 106a–107a.)  The *Guide* cautions, "Permits that are issued with incomplete sets of pre-mining data pursuant to…this section will normally include conditions requiring permittees to complete data collection prior to the time a stream or wetland is susceptible to mining induced changes."  (*Id.* at 107a.)

**B.**

Following Consol's submission of its application for a permit revision, the Department advised Consol by letter dated January 13, 2014, that its application contained numerous deficiencies, including its failure to identify nine stream segments for which biological monitoring points and biological data were required.  On January 23, 2014, Joel C. Folman, a Water Pollutant Biologist in the Department's District Mining Office, performed a site inspection of the expanded mining area, after which he determined that information regarding four of the nine missing segments should be included in the application.

Accordingly, in February 2014, the Department issued a revised permit granting Consol's request to conduct longwall mining activities in the expanded area subject to Special Condition No. 77, which stated:  "The company shall submit two Biological Monitoring (Appendix B) scores within 16 percent in accordance to [the *Guide*]" with respect to the subject streams.  (*Id.* at 13a.)

By letter dated March 5, 2014, Consol satisfied Special Condition No. 77, submitting the required pre-mining biological data for the subject streams. Nonetheless, on March 24, 2014, Consol filed an appeal asserting the following grounds:

5

[Consol] is aggrieved by, objects to and appeals from the Department's action because the action is arbitrary, capricious, contrary to law and constitutes an abuse of discretion, in that, *inter alia*:

(a) The imposition of Special Condition 77 is arbitrary, capricious, an abuse of discretion and contrary to law;

(b) The imposition of Special Condition 77 improperly modified a previously agreed to monitoring plan and was unreasonably inserted as a Special Condition shortly prior to revising [Consol]'s permit;

(c) Special Condition 77 was imposed without a factual or scientific basis;

(d) Special Condition 77 imposes costly and unnecessary monitoring requirements;

(e) There exists no lawful basis for imposing Special Condition 77;

(f) The stream segments covered by Special Condition 77 are not perennial for purposes of Subchapter F of Chapter 89 of 25 Pa. Code and the Department thus lacks the regulatory authority to impose said condition;

(g) By relying upon Technical Guidance Document 563-2000-655, *Surface Water Protection—Underground Bituminous Coal Mining Operations*, to justify the imposition of Special Condition 77 the Department has improperly imposed binding norms and regulatory requirements through a guidance document in violation of statutory rulemaking procedures; and

(h) The Department's pervasive use and reliance on Technical Guidance Document 563-2000-655, *Surface Water Protection—Underground Bituminous Coal Mining Operations* in establishing what information permit applicants must submit and in the Department's review of applications for underground

6

coal mining permits is arbitrary, capricious and contrary to law because the Department has imposed binding norms and regulatory requirements through a guidance document in violation of statutory rulemaking procedures.

(*Id.* at 3a.)

## C.

On April 4, 2014, the Department issued another permit revision removing Special Condition No. 77. It then filed a motion to dismiss Consol's appeal as moot, claiming that because the special condition which was the subject of the appeal was removed, there existed no case or controversy for the Board to adjudicate.

In support of its motion, the Department submitted the affidavit of Biologist Folman, who stated that he regularly conducts technical reviews of permit applications for underground coal mines, conducts stream surveys, monitors stream conditions, reviews wetland mitigation pans, and delineates wetlands. Biologist Folman further attested that after Consol submitted the pre-mining biological scores for the subject streams, "no further pre-mining biological data was required or requested for those streams" and that the condition "did not require Consol to submit any biological scores to establish post-mining stream conditions." (*Id.* at 31a.) Because Consol satisfied Special Condition No. 77, the Department removed it through a subsequent permit revision. (*Id.* at 40a.)[3]

---

[3] Intervenor, Center for Coalfield Justice, also filed a brief in support of the Department's motion to dismiss which raised substantially the same arguments as the Department raised.

In response, Consol contended that its appeal was not rendered moot by the April 2014 revision because: (1) it still had potential future obligations pursuant to Special Condition No. 77 insofar as the Department determines that the subject streams suffered adverse effects as a result of its mining activities and consequently requires it to collect post-mining biological data to compare with the pre-mining data; (2) its appeal was premised on various grounds unrelated to Special Condition No. 77; and (3) even if the removal of Special Condition No. 77 did moot the appeal, exceptions to the mootness doctrine apply. Alternatively, Consol sought leave to file an amended notice of appeal under 25 Pa. Code §1021.53(b).[4]

In support of its opposition, Consol submitted the affidavit of Jaculyn Duke, its Permitting Supervisor for its Pennsylvania Coal Operations, who stated that Consol complied with Special Condition No. 77 "under protest" incurring substantial monetary costs "so that it could ultimately receive the requested Permit Revision 173." (*Id.* at 131a.) According to Supervisor Duke, "notwithstanding the removal of Special Condition No. 77 from the Bailey Permit, [Consol] is still

---

[4] Regarding amendments to appeals:

> After the 20-day period for amendment as of right, the Board, upon motion by the appellant or complainant, may grant leave for further amendment of the appeal or complaint. This leave may be granted if no undue prejudice will result to the opposing parties. The burden of proving that no undue prejudice will result to the opposing parties is on the party requesting the amendment.

25 Pa. Code §1021.53(b).

8

subject to potential future obligations pursuant to the inclusion of additional monitoring requirements required by Special Condition No. 77" because should the Department determine that any of the subject streams were adversely impacted by Consol's mining activities, it "can impose post-mining biological monitoring obligations on [Consol] using the data that [Consol] was required to collect pursuant to Special Condition No. 77." (*Id.* at 132a.)

Consol also submitted a transcript of Biologist Folman's deposition during which he testified that he reviews permit applications submitted to the Department for compliance with Module 8. In conjunction with his review of Consol's application, he performed a site inspection at which time he determined that Consol's application was insufficient because it failed to include biological monitoring points for the subject streams. To rectify the deficiency, the Department imposed Special Condition No. 77.

In response to a question regarding what would happen if, after mining activities occurred, it were suspected that one of the subject streams had been adversely impacted, Biologist Folman responded that he would compare testing results for that stream to the results of a control stream.[5] For those that were required to be monitored as per Special Condition No. 77 and which were impacted by mining activities, "[Consol] would be required to augment the flow temporarily and go in and do repairs." (*Id.* at 157a.) Further, under the *Guide*,

---

[5] The *Guide* defines a "control stream" as a "stream that has not been affected by mining induced changes and that is used as a reference for determining whether changes in a stream being undermined are mining induced." (*Id.* at 85a.)

9

Consol would be required to do additional post-mining or post-restoration biomonitoring under those streams. Biologist Folman conceded that had Consol not complied with Special Condition No. 77, it would not have been permitted to conduct longwall mining activities in the expanded area. He explained that after Consol complied with the condition, it was struck as per standard Departmental policy.

Additionally, Consol relied upon several discovery responses it received from the Department, including the following explanation of the Department's factual and scientific basis for Special Condition No. 77:

> In order to protect the hydrologic balance, provide adequate pre-mining hydrologic information and assure that fish, wildlife and related environmental values are protected from the adverse effects of [Consol]'s mining, [Consol] must sample, monitor and provide a pre-mining biological score within the diverse stream sections ***in order to accurately determine if streams have recovered to their pre-mining conditions after mining has occurred***…."

(*Id.* at 264a) (emphasis added).

Although the Department denied a request for admission stating that it imposed a "continuing requirement" upon Consol to conduct biological monitoring at the locations identified in Special Condition No. 77, its explanation stated that Consol "will only be required to conduct biological monitoring at those locations in the future if its mining results in the loss of flow or if the uses of the streams are impaired." (*Id.* at 289a.) Further, in response to a request for admission inquiring

10

whether the same outcome would result even though Special Condition No. 77 was struck, the Department provided the same explanation.

## II.

Upon consideration of the evidence presented, the Board issued a majority opinion granting the Department's motion to dismiss, reasoning that seven of the eight grounds stated in the notice of appeal were moot because they concerned the timing of factual and scientific basis for cost of implementing and the legal and regulatory basis for Special Condition No. 77:

> Consol's contention that, notwithstanding its compliance with the condition and the subsequent removal of the condition from the permit, it may "still [be] subject to potential future obligations *pursuant* to the inclusion of additional monitoring requirements required by Special Condition No. 77" is clearly speculative, and ultimately inconsistent with the plain language of Special Condition 77. (Consol's Opp'n Br. Ex. B ¶ 23 (emphasis added).) Special Condition 77 required that Consol "shall submit" two Biological Monitoring scores in accordance with the *Guid*[*e*] for each of four stream segments "*prior to the commencement of longwall mining*." (Notice of Appeal Ex. A (emphasis added).) The plain language of Special Condition 77 imposed only *pre-mining* obligations. That fact is not changed by speculation that the Department may compare the pre-mining information Consol submitted in response to Special Condition 77 to *post-mining* data obtained from Consol, or any other source. Consol acknowledges that it submitted the necessary information before filing its appeal. It has already complied with all obligations imposed by Special Condition 77.

11

(2/12/15 Board Opinion and Order on Department's Motion to Dismiss, at 11) (internal footnote omitted). The Board further explained that even if these bases of appeal were meritorious, it was unable to provide relief to Consol because it already complied with the condition.

To the extent Consol objected to the Department's reliance on the *Guide*, the Board explained that Consol failed to identify any manner in which the *Guide* was used with regard to the Department's issuance of the revised permit, other than in the imposition of Special Condition No. 77 for which the appeal was moot, and it declined to address in an abstract context the Department's general use of the *Guide* in reviewing permit applications for underground coal mining.

Moreover, the Board determined that no exceptions to the mootness doctrine applied because: Consol may challenge the propriety of any post-mining requirements implemented at a later date when such an appeal is ripe; to the extent the conduct complained of is capable of repetition but evades review, it evades review only because Consol complied with Special Condition No. 77; and the appeal does not constitute a matter of great public importance since the Department did not take any enforcement action against Consol since Consol willingly complied with Module 8 when it filed its applications.

Finally, the Board denied Consol's alternative request for leave to amend its notice of appeal under 25 Pa. Code §1021.53(b) because it failed to address the nature of its proposed amendment, the basis for permitting amendment at that stage of the litigation, or how the amended appeal would differ from the

12

instant appeal.  Regardless, the Board concluded without explicating that Consol's motion was procedurally improper, finding that "Consol's request to amend is simply an attempt to pull its appeal back from the brink of mootness." (*Id.* at 19).[6] Subsequently, Consol filed a petition for reconsideration which was denied on the basis that Consol failed to show a compelling or persuasive reason for the grant of reconsideration pursuant to 25 Pa. Code §1021.152(a)[7] determining that Consol

---

[6] In a concurring opinion in which Judge Michelle Coleman joined, Judge Richard Mather, Sr. wrote separately to question the Department's decision to issue the revised permit containing Special Condition No. 77, reasoning that: "It is well established that the Department should not issue a permit before it completes its technical review of all required and necessary materials in a permit application." (2/12/15 Board Opinion and Order on Department's Motion to Dismiss, at 22.)

On the other hand, Judge Bernard Labuskes, Jr. authored a dissenting opinion in which Chief Judge Renwand joined, finding that the appeal should not have been dismissed for mootness because a factual issue existed regarding the future impact Special Condition No. 77 will have on Consol.  Specifically, the dissent explained:

> It is true that there is nothing in these averments to suggest that there is a 100 percent chance of a future impact.  However, that is too strict of a standard in deciding whether prudence compels us to dismiss a case as moot in the context of a motion to dismiss.  It is no stretch at all for me to envision that Consol's concern of possible future effects is quite credible and Special Condition 77 will in effect have created future obligations that would not have otherwise existed.  It is certainly possible that nothing will ever come from Special Condition 77.  However, if that were the standard for judging mootness, I suspect that many of the appeals filed before the Board would be moot *ab initio*.  Here, it is quite possible that the Department's action could have a lingering effect. This possibility, far from remote, counsels in favor of erring on the side of preserving Consol's appeal rights.

(*Id.* at 30.)

[7] The Board's Regulations provide that:

**(Footnote continued on next page…)**

13

simply disagreed with the Board's order and sought to reargue its case.[8]  This appeal followed.[9]

---

**(continued…)**

> (a) …Reconsideration is within the discretion of the Board and will be granted only for compelling and persuasive reasons.  These reasons may include the following:
>
> (1) The final order rests on a legal ground or a factual finding which has not been proposed by any party.
>
> (2) The crucial facts set forth in the petition:
>
> (i) Are inconsistent with the findings of the Board.
>
> (ii) Are such as would justify a reversal of the Board's decision.
>
> (iii) Could not have been presented earlier to the Board with the exercise of due diligence.

25 Pa. Code 1021.152(a)(1)−(2).

[8] Again, Chief Judge Renwand and Judge Labuskes dissented from the Board's denial of Consol's petition for reconsideration because "Consol's petition illuminates the fact that the majority's decision on the motion to dismiss 'rests on a legal ground or a factual finding which has not been proposed by any party.'"  (2/12/15 Board Opinion and Order on Department's Motion to Dismiss, at 10.)

[9] In reviewing decisions by the Board, we are limited to determining whether the Board committed an error of law, violated constitutional rights, or whether substantial evidence supports its findings of fact. *Joseph J. Brunner, Inc. v. Department of Environmental Protection*, 869 A.2d 1172, 1173 n. 2 (Pa. Cmwlth.), *appeal denied*, 885 A.2d 44 (Pa. 2005).

**III.**

**A.**

Consol first contends that the Board erred in rejecting as speculative Consol's averments that the Department could and would use the pre-mining biological data collected pursuant to Special Condition No. 77 to Consol's detriment by comparing it with post-mining data, and based upon that comparison, mandating reparative measures. By doing so, Consol argues that the Board improperly shifted the burden to it to establish that post-mining obligations would arise.

The Department's motion to dismiss was adjudicated pursuant to 25 Pa. Code §1021.94, providing in pertinent part:

> (e) An affidavit or other document relied upon in support of a dispositive motion or response, that is not already a part of the record, shall be filed at the same time as the motion or response or it will not be considered by the Board in ruling thereon.

> (f) When a dispositive motion is made and supported as provided in this rule, an adverse party may not rest upon mere allegations or denials of the adverse party's pleading or its notice of appeal, but the adverse party's response must set forth specific issues of fact or law showing there is a genuine issue for hearing. If the adverse party fails to adequately respond, the dispositive motion may be granted against the adverse party.

25 Pa. Code § 1021.94(e)–(f).

15

In accordance with this Regulation, both the Department and Consol relied upon documents outside of the pleadings, bringing the motion to dismiss within the purview of 25 Pa. Code §1021.94(f). Consol was not entitled to "rest upon mere allegations or denials" once the Department supported its claim that the appeal was moot with credible evidence. At this point, the burden shifted to Consol to show that a genuine issue existed. The Board was not required to accept and did not accept Consol's general averments that harm would result. Accordingly, there is no merit in Consol's argument that the Department's motion should have been dismissed based upon Consol's statement of facts alone.

## B.

Next, Consol argues that the Board erred in determining that its appeal was rendered moot by its satisfaction of and the Department's subsequent removal of Special Condition No. 77.

### 1.   *The Scope of the Appeal Before the Board*

In this regard, Consol claims that its appeal before the Board was not limited to the imposition of Special Condition No. 77 but challenges:

> the timing of the imposition of the Special Condition 77, the regulatory authority (or lack thereof) for imposition of Special Condition 77, the Department's use and reliance upon the [*Guide*] to impose binding norms and regulatory requirements on [Consol], and the Department's pervasive use of the [*Guide*] in the permitting process.

16

(Br. for Petitioner, at 30.) Notwithstanding the Special Condition 77, Consol contends that these issues remain ripe for adjudication.

The action from which Consol appealed was the Department's issuance of the revised permit granting Consol's application subject to Special Condition No. 77. And once it was removed by the Department, the relief it requested in its appeal was obtained. While Consol allegedly challenges the Department's general use of and reliance on the *Guide*, Consol has not asserted with any specificity how or why the Department's use of the *Guide* is unauthorized. In any event, the Guide was only used to purportedly impose Special Condition No. 77, and once it was removed, Consol was no longer purportedly aggrieved by the Department's use of the *Guide* in reviewing its permit application.

Moreover, a plain reading of Consol's notice of appeal to the Board supports the same conclusion. Of the eight bases asserted, the first seven of them expressly challenge the condition on various grounds. The eighth ground, challenging the Department's reliance on the *Guide* for determining and evaluating the contents of permit applications clearly pertains only to Special Condition No. 77, as no other bases have been asserted and since the revised application was granted in all other respects. Therefore, should we find that Consol's compliance with Special Condition No. 77 and the Department's subsequent withdrawal of it moots the appeal, there remain no independent bases of review.

17

## 2. Relief Available to Consol

Consol also asserts that the Board erred in concluding that it could provide no relief to Consol because the Board could reverse the Department's determination that the subject streams qualify as "perennial" or "perennial-diverse" and, therefore, that they are subject to the pre-mining biological monitoring requirements. Further, Consol suggests that if the Board renders such a finding, it could preclude the Department from using this data for comparison purposes in the future.

Generally, "[t]he Court will dismiss an appeal as moot unless an actual case or controversy exists at all stages of the judicial or administrative process." *Horsehead Resource Development Co. v. Department of Environmental Protection*, 780 A.2d 856, 858 (Pa. Cmwlth. 2001) (*en banc*), *appeal denied*, 796 A.2d 987 (Pa. 2002). "[T]he existence of a case or controversy requires a real and not a hypothetical legal controversy and one that affects another in a concrete manner so as to provide a factual predicate for reasoned adjudication, with sufficiently adverse parties to sharpen the issues for judicial resolution." *City of Philadelphia v. Southeastern Pennsylvania Transportation Authority (SEPTA)*, 937 A.2d 1176, 1179 (Pa. Cmwlth. 2007) (*en banc*). The key inquiry in determining whether a case is moot is whether the court or agency will be able to grant effective relief and whether the litigant has been deprived of the necessary stake in the outcome of the litigation. *Al Hamilton Contracting Co. v. Department of Environmental Resources*, 494 A.2d 516, 518 (Pa. Cmwlth. 1985).

In support of its position, Consol cites *Al Hamilton Contracting Co.*, a case in which the Department inspected a company's operations and found that an underdrain was plugged with silt and other debris. Following the inspection, the Department directed the company to clean the drain as provided in the inspection report. A subsequent inspection revealed that the underdrain was still plugged and, consequently, an abatement order mandating that the company clean the drain was issued. The next inspection revealed that the company complied with the initial directive and the abatement order. Nonetheless, the company filed an appeal from the abatement order, contending that it lacked a factual basis and was arbitrary and capricious, among other grounds. However, noting that the order had been fully complied with and finding that it could grant no relief to the company, the Board dismissed the appeal as moot.

On appeal, this Court affirmed the ruling that in and of itself, the company's challenge to the order was moot, reasoning:

> While sums of money may have been expended, the clean up is now complete. Had [the company] seriously questioned the propriety of the abatement order it could have requested a stay pursuant to [Department] regulation 21.76, 25 Pa. Code § 21.76. This it failed to do. Thus, it took the clean-up action at its own risk that such action would not, in fact, be found to be legally required. The fact that [the company] was deprived of property without a hearing because of its compliance with the abatement order does not justify ignoring the fact that the appeal is moot with respect to the injury of expenditure of time and money to achieve compliance with the abatement order.

19

*Id.* at 518. Likewise, we rejected the company's argument that its appeal was not moot because a civil penalty had been assessed against it, determining that a separate cause of action enabled the company to challenge whether a violation actually occurred and the amount of the penalty, thus depriving it of a stake in the current litigation.

Nonetheless, the company highlighted that in assessing future civil penalties, the Department considers prior violations and that by denying the company an opportunity to litigate the propriety of the underlying abatement order, the Department subjected the company to the enhanced penalty provision in 25 Pa. Code §86.194. To this extent, we agreed with the company's claim that it maintained a stake in the litigation.

However *Al Hamilton Contracting Co.* is inapplicable here because Consol is not faced with an abatement order that can be used against it cumulatively in the future to assess penalties. Indeed, Consol has not yet been confronted with an order requiring it to undergo any actions due to the adverse effects its longwall drilling has caused the subject stream segments. The only requirements the Department imposed on Consol were those in Special Condition No. 77, which has been withdrawn and, therefore, "no longer exists." *Horsehead Resource Development Co. v. Department of Environmental Protection*, 780 A.2d 856, 858 (Pa. Cmwlth. 2001) (*en banc*) (citing with approval the Board's position), *appeal denied*, 796 A.2d 987 (Pa. 2002). As such, "the Board cannot provide meaningful relief with regard to it." *Id.*

Moreover, the Board is authorized only to exercise the powers which have been expressly conferred upon it by statute or provided by necessary implication. *Pequea Township v. Herr*, 716 A.2d 678 (Pa. Cmwlth. 1998). In this regard, Section 4 of the Environmental Hearing Board Act provides:

> (a) General rule.--The board has the power and duty to hold hearings and issue adjudications under 2 Pa.C.S. Ch. 5 Subch. A (relating to practice and procedure of Commonwealth agencies) on orders, permits, licenses or decisions of the department.
>
> (b) Powers continued.--The board shall continue to exercise the powers to hold hearings and issue adjudications which (powers) were vested in agencies listed in section 1901-A of the act of April 9, 1929 (P.L. 177, No. 175), known as The Administrative Code of 1929.

Act of July 13, 1988, P.L. 530, 35 P.S. §7514(a)–(b). Aside from this authorization, the Board does not have equitable powers and cannot enjoin the Department from taking action which it has not yet taken. *See Pequea Township*, 716 A.2d at 686. In other words, the Board's power is limited to adjudicating *actual* orders or decisions of the Department, not anticipatory ones.

To the extent Consol points to the future harm that may result from the Department's use of the pre-mining biological data it supplied, Consol is not without a remedy. In the event the Department does use the data for comparison purposes with post-mining data from the same biological points, determines that those comparisons yield differences beyond the maximum allowances, and

21

consequently, requires Consol to undertake additional monitoring, testing or reparative measures, Consol may appeal the Department's order at that time.

In this respect, we find the instant case akin to *Horsehead Resource Development Co. v. Department of Environmental Protection*, 780 A.2d 856 (Pa. Cmwlth. 2001) (*en banc*), 796 A.2d 987 (Pa. 2002). In this case, a producer marketed a mineral aggregate as a sub-base in road construction. The producer and Department entered a consent decree in a federal district court establishing a protocol for the producer to apply for Department concurrence as to the status of the aggregate for proposed uses, and the producer sought concurrence regarding use of the aggregate for road building. However, the Department found the application deficient, and the producer requested numerous extensions, after which the Department granted an indefinite extension. The producer did not file any further documents.

Subsequently, after learning that the producer sold the aggregate to two purchasers for the purposes of road building, the Department issued compliance orders to the purchasers, directing them to cease use of the product on the basis that it constituted "waste" under the Solid Waste Management Act, Act of July 7, 1980, P.L. 380, *as amended*, 35 P.S. §§6018.101–6018.100, and to submit plans regarding removal of the component. Both purchasers appealed, as did the producer. Ultimately, the first purchaser complied with the order, and the second entered into a consent decree with the Department resulting in the Department's rescission of the orders and the purchasers' withdrawal of their appeals.

The Department filed a motion to dismiss the producer's appeal, claiming that because the Department withdrew its compliance orders, the Board could no longer provide relief to the producer and, therefore, that the issue was moot. Alternately, the producer argued that it remained aggrieved because the orders negatively impacted its ability to market its aggregate.

The Board explained that its power to grant relief was not negated by the Department's withdrawal of its compliance orders because the producer's "interest in the outcome remained, and the Board could decide whether the [Department] abused its discretion in issuing the compliance orders in the first place." *Horsehead Resource Development Co.*, 780 A.2d at 857–58. However, the Board noted that the producer also filed an administrative proceedings request for a beneficial use determination by the Department with respect to the aggregate. As such, the Board reasoned that although it had jurisdiction to determine the marketability of the aggregate within the scope of the company's appeal, it would benefit from the Department's "exercise of its greater expertise initially in setting forth the scientific issues to resolve the question of marketability" and, therefore, would abstain from deciding the matter because a simultaneous administrative proceeding was pending. *Id.* at 858. The Board emphasized that it would entertain an appeal from the Department's ruling, though.

On appeal, this Court affirmed the Board's ruling, finding the appeal moot because "[t]he Board could not have ordered any relief in regard to the rescinded orders" as per the test under *Al Hamilton Contracting Co. Id.* Moreover, we continued:

23

the fact remains that under the circumstances of this particular case [the producer] has available to it a procedure for securing a reviewable determination of the status of [the aggregate]. Under the terms of the pre-existing consent decree, to which [the producer] freely agreed in the federal proceeding and which must be given full faith and credit in state courts…[the producer] may, and in fact is required to, complete the coproduct submission to [the Department]. A negative determination would be subject to appeal to the Board, and the Board's determination would be subject to review by this Court….

*Id.* at 859–60.

The concept that the Department action no longer exists because it was withdrawn applies with equal force here. Indeed, to find that Consol will be harmed, we must assume that Consol will adversely affect the subject stream segments beyond the extent permitted, that the Department will order post-mining biological data, compare the pre- and post-mining biological scores, detect an excessive change, and order Consol to take action. Doing so requires us to engage in pure conjecture, an invitation we reject.

## C.

Moreover, Consol contends that even if the instant appeal is moot, the Board erred in finding that none of the exceptions to the mootness doctrine apply. Even where an appeal is technically moot, "where the conduct complained of is capable of repetition yet likely to evade review, where the case involves issues important to the public interest or where a party will suffer some detriment without the court's decision," a court may proceed to address the merits of a claim. *Sierra*

24

*Club v. Pennsylvania Public Utility Commission*, 702 A.2d 1131, 1134 (Pa. Cmwlth. 1997) (*en banc*), *aff'd*, 731 A.2d 133 (Pa. 1999).

To come within the purview of the first exception, the appellant must establish that: (1) "the duration of the challenged action is too short to be fully litigated prior to its cessation or expiration"; and (2) "there is a reasonable expectation that the same complaining party will be subjected to the same action again." *Philadelphia Public School Notebook v. School District of Philadelphia*, 49 A.3d 445, 449 (Pa. Cmwlth. 2012). In this case, Consol argues that "the next time [it] submits a permit application or permit revision application that involves mining under a stream, there is nothing to prevent the Department from requiring biological monitoring in a future longwall mining application" and that the Department may wait to impose such requirements until the eleventh hour. (Br. for Petitioner, at 40–41.) Essentially, Consol argues that the Department will impose a dubious special condition at the last moment, making it impractical for a permit applicant to appeal because of the financial pressure to begin mining operations.

Regardless, because the biological data has not yet been employed by the Department to require any future action, the imposition of Special Condition No. 77 does not evade review. As discussed above, the basis (or lack thereof) for the condition and the timing of its imposition may be challenged if and when the Department takes further action. Moreover, should Consol be subjected to a similar condition again in the future, it can secure instant adjudication by appealing the condition immediately rather than first complying with it to ensure that the condition is not withdrawn. As such, Consol has failed to demonstrate that the

25

Department's action satisfies the elements of the first exception to the mootness doctrine.

Nonetheless, Consol argues that this Court should adjudicate its appeal because it involves a matter of great public importance. Essentially, the crux of Consol's argument is that the Department exceeded its authority by imposing Special Condition No. 77 in reliance on the *Guide*. This argument does not implicate a matter of *great public* importance. After all, Special Condition No. 77 was handcrafted by the Department to address the deficiencies that were unique to Consol's application for a permit revision, insofar as the Department found that Consol failed to address four stream segments in its application. Special Condition No. 77, around which this appeal is based, is a unique condition applying only to Consol and does not implicate concerns of great public importance.

Finally, Consol asserts that it will suffer a detriment in the absence of this Court's ruling on its appeal because "the Department can later use the data that it impermissibly required [Consol] to collect in crafting and imposing post-mining requirements" thereby imposing further costs on Consol. (Br. for Petitioner, at 43.) As explained above, should the Department actually impose future requirements with regard to the pre-mining data Consol supplied, Consol may appeal the Department's order at that time, thereby allowing it to seek review when the issue is ripe. As such, Consol has not established that it will suffer a detriment if it is forced to wait until it suffers an actual harm to seek review.

**D.**

Consol alleges that the Board's order and opinion deny Consol its constitutionally protected right of due process to seek judicial review because it had no reasonable choice but to satisfy Special Condition No. 77 because, otherwise, its mining efforts would have been substantially delayed, resulting in possible damage to its equipment, potentially requiring the termination of its 435-member workforce and rendering it unable to meet its contractual obligations.

While those factors were taken into consideration by Consol in not challenging Special Condition No. 77, these difficulties are not so unlike those faced by every litigant. Indeed, every appeal takes time to resolve, and during the adjudication process, the parties are often uncertain of their respective rights and obligations pending a final decision. While Consol had competing interests at play—namely, a workforce to compensate, contractual obligations to fulfill, equipment to maintain, and work to begin so as not to suffer from lost profits on the one hand versus allegedly unauthorized conditions to challenge on the other hand—the decision as to how to prioritize those interests rested exclusively with Consol. Obviously, it could have purchased new equipment, terminated its work force, foregone certain profits, and paid liquidated damages for any resultant breaches of contract had it desired to appeal the Department's imposition of Special Condition No. 77 immediately. We do not question the wisdom of Consol's decision in this regard but only emphasize that just because Consol was forced to make a choice with regard to litigation strategy does not mean that it was deprived of its due process rights. While procedural due process guarantees "adequate notice, the opportunity to be heard, and the chance to defend oneself

before a fair and impartial tribunal having jurisdiction over the case," *Commonwealth v. Turner*, 80 A.3d 754, 764 (Pa. 2013), it does not guarantee a party's right to have its cake and eat it, too.

In its brief, Consol forewent any analysis of the elements of procedural due process,[10] instead relying upon legal conclusions that it was denied a meaningful opportunity to seek review and redress of governmental action. However, what it ignores is if and when its appeal ripens, it will be afforded such an opportunity.

**E.**

Alternatively, Consol asserts that the Board erred in denying its request for leave to amend its notice of appeal, which was contained within its response to the Department's motion to dismiss and not filed separately. Noting that the Department did not object to its request, Consol argues that the Board should have overlooked its technical deficiencies in accordance with 25 Pa. Code §1021.4[11] and granted it leave to file an amended notice of appeal.

---

[10] The Fourteenth Amendment provides in pertinent part, "nor shall any State deprive any person of life, liberty, or property without due process of law…." U.S. Const. amend. XIV, §1. Pennsylvania courts "examine procedural due process questions in two steps: the first asks whether there is a life, liberty, or property interest that the state has interfered with; and the second examines whether the procedures attendant to that deprivation were constitutionally sufficient." *Turner*, 80 A.3d at 764.

[11] Regarding the construction and application of rules:

> The rules in this chapter shall be liberally construed to secure the just, speedy and inexpensive determination of every appeal or proceeding in which they are applicable. The Board at every stage

**(Footnote continued on next page…)**

28

In urging this Court to apply 25 Pa. Code §1021.4, Consol overlooks the express language of 25 Pa. Code §1021.53(b), providing that leave to amend an appeal may be granted only if "no undue prejudice will result to the opposing parties" and that the burden of proving the same rests upon the party requesting amendment. 25 Pa. Code §1021.53(b). Regardless of its technical deficiencies, Consol's request for leave to amend contained a substantive deficiency insofar as it failed to provide any facts or averments demonstrating that the requested relief would not result in prejudice to the Department. Although the Department may not have formally opposed the request,[12] Consol and not the Department bore the burden of establishing a lack of prejudice, and it failed to satisfy its burden in this regard. 25 Pa. Code §1021.53(b).

Accordingly, we affirm the Board's order dismissing Consol's appeal as moot.

_____
DAN PELLEGRINI, President Judge

_____
**(continued…)**

> of an appeal or proceeding may disregard any error or defect of procedure which does not affect the substantial rights of the parties.

25 Pa. Code §1021.4.

[12] It is questionable whether the Department was required to oppose the request since the request was not presented in a separate motion and, therefore, a response was not necessary under 25 Pa. Code §1021.91.

IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Consol Pennsylvania Coal Company,  :
LLC,                               :
                     Petitioner    :
                                   :
          v.                       :
                                   :
Department of Environmental        :
Protection,                        :
                     Respondent    :    No. 351 C.D. 2015

# **O R D E R**

AND NOW, this 15<u>th</u> day of <u>December</u>, 2015, the order of the Environmental Hearing Board in the above-captioned case is affirmed.

_____

DAN PELLEGRINI, President Judge